ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL XI

| ENERGEÓLICA DE PUERTO RICO LLC. Recurrente v. DEPARTAMENTO DE LA VIVIENDA Recurrido | TA2025RA00378 | *Revisión Administrativa* procedente del Departamento de la Vivienda Caso Núm.: AR-24-00240 Sobre: Revisión Administrativa (PR-ER2-00139) |
|---|---|---|

Panel integrado por su presidenta, la Jueza Rivera Marchand, la Jueza Mateu Meléndez, la Jueza Boria Vizcarrondo y el Juez Robles Adorno.

Rivera Marchand, Jueza Ponente.

**SENTENCIA**

En San Juan, Puerto Rico, a 21 de enero de 2026.

Comparece ante nos Energeólica de Puerto Rico LLC (Energeólica o recurrente) y nos solicita que revisemos la *Resolución Final y Orden*, emitida el 26 de septiembre de 2025 por el Departamento de la Vivienda (Departamento o recurrido).[1] En el aludido dictamen, el Departamento archivó con perjuicio la *Solicitud de Revisión Administrativa* presentada por Energeólica sobre la determinación de inelegibilidad emitida en su contra para participar de un programa de financiamiento de fondos federales.

Por los fundamentos que exponemos a continuación, confirmamos la determinación recurrida.

**I.**

El 30 de enero de 2024, Energeólica presentó una solicitud ante la Oficina del Programa para la Fiabilidad y la Resiliencia de la Energía Eléctrica (Oficina del Programa ER2), a través del sistema

---

[1] Sistema Unificado de Manejo y Administración de Casos (SUMAC) TA, Entrada Núm. 1, Apéndice *Anejo 1 – Resoluci[ó]n Final y Orden*. Notificada el 29 de septiembre de 2025.

electrónico *Grant Application Portal*. Ello, con el fin de participar del programa de financiamiento de la Subvención en Bloque para el Desarrollo Comunitario-Recuperación de Desastres (conocido como CDBG-DR, por sus siglas en inglés) para sufragar el proyecto propuesto *Energeólica Power Park*, un parque de producción y almacenamiento de energía renovable. Junto con su solicitud, acompañó una serie de documentos requeridos por las *CDBG-DR Electrical Power System Enhancements & Improvements Program Guidelines for the Electrical Power Reliability and Resilience Program* de 26 de junio de 2023 (Guías del Programa ER2), normativas que rigen el proceso de solicitud y selección del programa de financiamiento.

Ulteriormente, la Oficina del Programa ER2 cursó dos (2) requerimientos de información adicional a Energeólica,[2] los cuales esta respondió.[3]

No obstante, el 31 de julio de 2024, la Oficina del Programa ER2 notificó a la recurrente una determinación de inelegibilidad dado que esta no produjo evidencia de financiamiento alterno al fondo CDBG-DR para cubrir el 40% del costo total del proyecto. Más bien, la Oficina del Programa ER2 indicó que la recurrente solo identificó un 4% proveniente de fondos privados y que anticipó que el restante sería provisto por fuentes no identificadas.[4]

Ante ello, el 5 de agosto de 2024, Energeólica solicitó la reconsideración de la determinación de inelegibilidad y adujo que, el 26 de junio de 2024, proveyó un paquete completo y detallado en el cual consignaba las fuentes de financiamiento en cumplimiento con los requisitos del Programa ER2.[5] Junto con su solicitud, acompañó misivas de entidades que se comprometieron al financiamiento. Sin embargo, el 20 de agosto de 2024, la Oficina del Programa ER2 reiteró su determinación de inelegibilidad.[6]

---

[2] SUMAC TA, Entrada Núm. 1, Apéndice 1, Anejos 4.5 y 4.6.
[3] *Íd.*, Anejo 4.7.
[4] *Íd.*, Anejo 4.8.
[5] *Íd.*, Anejo 4.9.
[6] SUMAC TA, Entrada Núm. 1, Apéndice 1, Anejo 4.10.

Inconforme, el 6 de septiembre de 2024, el recurrente cuestionó la determinación ante el Departamento, por medio de una *Solicitud de Revisión Administrativa.*[7]

En reacción, el recurrido presentó una *Moción de Desestimación* y arguyó que Energeólica no adujo un reclamo que justificara la concesión de un remedio.[8] En particular, señaló que la recurrente no identificó las fuentes de ingreso para cubrir el 40% del costo total del proyecto, conforme lo exigen las Guías del Programa ER2. En ese sentido, adujo que Energeólica se limitó a presentar que contaba con una estrategia de obtención de medios de financiamiento privado. Igualmente, resaltó que la recurrente anticipaba que el 36% del costo del proyecto fuera financiado por fuentes no identificadas. Por tanto, esgrimió que Energeólica incumplió con un requisito de umbral para ser considerada elegible.

Sobre el planteamiento de que la agencia debió utilizar la información provista por la recurrente, el Departamento ripostó, en apretada síntesis, que ello no subsanó el incumplimiento de Energeólica de identificar dentro de los términos, las fuentes de financiamiento para el 40%.

De igual forma, arguyó que las Guías del Programa ER2 requieren que los solicitantes proporcionen información completa y precisa, así como una descripción de las fuentes y cantidades de los fondos externos comprometidos. En ese sentido, adujo que la recurrente no tenía razón al indicar que las guías no exigían información detallada.

Ante el petitorio dispositivo del recurrido, Energeólica presentó una *Moción en Oposición a "Moción de Desestimación".*[9] Esencialmente, reiteró haber cumplido con el requisito de demostrar fuentes de financiamiento para el 40% del costo total del proyecto y sostuvo que las Guías del Programa ER2 no requerían que se

---

[7] *Íd.,* Anejo *Documento Principal.*
[8] *Íd.,* Apéndice 6.
[9] *Íd.,* Apéndice 7.

presentara esa información en la solicitud inicial, sino que podía ser presentada dentro del proceso de evaluación.

Asimismo, señaló que, en los requerimientos de información, no se solicitó información sobre financiamiento, lo cual era demostrativo de que la Oficina del Programa ER2 no identificó deficiencias en ese aspecto en la solicitud. Igualmente, expuso que el *Grant Application Portal* permaneció habilitado para que los solicitantes presentaran documentos suplementarios y que la Oficina del Programa ER2 confirmó el recibo de los documentos suplementarios que Energeólica presentó. Por consiguiente, arguyó que el proceso de evaluación no había cerrado y reiteró que era arbitrario el planteamiento de que presentó la información fuera del periodo de evaluación.

En respuesta, el recurrido instó una *R[é]plica a Oposición a Moción de Desestimación* en la que reiteró los planteamientos esbozados en su solicitud de desestimación.[10]

Tras la celebración de una vista argumentativa ante un oficial examinador, ambas partes presentaron escritos en apoyo a sus respectivas posiciones.[11]

Tras varios incidentes, el 26 de septiembre de 2025, el foro administrativo emitió la *Resolución Final y Orden* recurrida, mediante la cual desestimó con perjuicio el recurso de revisión administrativa presentado por la recurrente.[12] En esencia, determinó que, en la primera fase de la competencia, Energeólica incluyó documentos en los que acreditaba haber identificado financiamiento externo a los fondos CDBG-DR ascendentes al 4% del costo total, cuando el requisito de umbral para ser elegible al programa era contar con, al menos, el 40% de este. Asimismo, resaltó que los documentos en los que la recurrente acreditó el 36% restante, fueron presentados el 26 de julio de 2024, mientras que el

---

[10] SUMAC TA, Entrada Núm. 1, Apéndice 8.
[11] *Íd.*, Apéndices 9 y 10.
[12] *Íd.*, Apéndice *Anejo 1 – Resoluci[ó]n Final y Orden*. Notificada el 29 de septiembre de 2025.

término para tramitar la solicitud culminó el 30 de enero de 2024, fecha para la cual Energeólica debió presentar todos los documentos requeridos.

Inconforme, el 20 de octubre de 2025, la recurrente interpuso una *Solicitud de Reconsideración.*[13] En síntesis, adujo que el dictamen se basó en las Guías del Programa ER2 enmendadas el 23 de enero de 2025 y no en las Guías del Programa ER2 de 2 de junio de 2023, las cuales adujo que eran el texto normativo que el Departamento debió utilizar.

En cuanto a lo anterior, si bien esgrimió que la aplicación retroactiva era improcedente, Energeólica indicó que la versión de 2025 de las Guías del Programa no era distinta a la del 2023 en cuanto a que no se requería a los solicitantes que presentaran evidencia detallada del financiamiento alterno al fondo CDBG-DR, sino que solo fuera identificado y descrito. Asimismo, reiteró que el *Grant Application Portal* continuaba abierto cuando sometió los documentos complementarios, por lo que expuso haber entendido que el recurrido extendió, implícitamente, el término para suplementar las solicitudes.

Expirado el término sin que el foro administrativo acogiera el petitorio de reconsideración, y aun inconforme, el 4 de diciembre de 2025, Energeólica recurre ante nos mediante un recurso de *Revisión de Decisión Administrativa* en el que señala al recurrido por la comisión de los siguientes errores:

> A. Erró el Departamento de la Vivienda al evaluar y archivar la Solicitud de Revisión Administrativa de Energeólica basándose en la versión más reciente de las Guías — publicada el 23 de enero de 2025— cuando, para la fecha límite de presentación de la solicitud inicial (30 de enero de 2024), dicha versión no existía y la única guía vigente era la primera versión publicada el 2 de junio de 2023.

> B. Erró el Departamento de la Vivienda al interpretar las Guías del Programa ER2 determinando que como requisito de umbral de elegibilidad Energeólica debía presentar evidencia de fondos externos al Programa para costear al menos un 40% del costo total del proyecto a pesar de que las claras e inequívocas Guías del Programa ER2 meramente requieren una descripción de estos.

---

[13] SUMAC TA, Entrada Núm. 1, Apéndice 4.

C. Erró el Departamento de la Vivienda al determinar que Energeólica no logró cumplir con los criterios de umbral y, por tanto era inelegible a pesar de que la Solicitud oportunamente presentada por la Recurrente era una completa y precisa que, dado la presentación de información adicional, va más allá del cumplimiento con todos los requisitos de umbral.

D. Erró el Departamento de la Vivienda al negarse a considerar la información suplementaria presentada por Energeólica dentro del término adicional implícitamente concedido por la propia agencia al dejar el sistema abierto y que forma parte del expediente administrativo.

El 23 de diciembre de 2025, el Departamento presentó una *Moción de Término para Presentar Alegato en Oposición* mediante la cual solicitó una prórroga para presentar su posición.[14] Así pues, el 8 de enero de 2026, emitimos y notificamos una *Resolución* por virtud de la cual concedimos dicha solicitud.[15]

Oportunamente, el 14 de enero de 2026, el recurrido compareció a través de un *Alegato en Oposición a Solicitud de Revisión de Decisión Administrativa.*[16] De ese modo, con el beneficio de la comparecencia de ambas partes, y la totalidad del expediente ante nos, procedemos a disponer del presente asunto, no sin antes exponer la normativa jurídica aplicable.

## II.

### A. La Revisión Judicial y la Deferencia Judicial

El Artículo 4.006 (c) de la Ley Núm. 201 de 22 de agosto de 2003, según enmendada, mejor conocida como la *Ley de la Judicatura del Estado Libre Asociado de Puerto Rico de 2003*, 4 LPRA sec. 24y, faculta al Tribunal de Apelaciones a atender las decisiones, órdenes y resoluciones finales de organismos o agencias administrativas. Al momento de revisar una decisión administrativa, el principio rector es el criterio de la razonabilidad de las decisiones y actuaciones de la agencia. *Hernández Feliciano v. Mun. Quebradillas*, 211 DPR 99 (2023); *Torres Rivera v. Policía de PR*, 196 DPR 606 (2016); *IFCO Recycling v. Aut. Desp. Sólidos*, 184 DPR 712 (2012). Todas las decisiones administrativas gozan de una

---

[14] SUMAC TA, Entrada Núm. 4.
[15] *Íd.*, Entrada Núm. 5.
[16] *Íd.*, Entrada Núm. 6.

presunción de legalidad y corrección, por lo cual la parte que las impugne debe producir suficiente evidencia para derrotarla. *Íd.*

Las facultades adjudicativas de una agencia están regidas por la Ley Núm. 38 de 30 de junio de 2017, según enmendada, mejor conocida como la *Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico*, 3 LPRA sec. 9601 *et seq.* (LPAU), y por la jurisprudencia aplicable. La Sección 3.1 de la LPAU, 3 LPRA sec. 9641, requiere que las agencias fundamenten sus resoluciones con determinaciones de hecho y conclusiones de derecho. Estas determinaciones deben reflejar que se consideraron y resolvieron los conflictos de prueba y, además, deben describir tanto los hechos probados como los rechazados. *Empresas Ferrer v. ARPe*, 172 DPR 254, 265 (2007).

De igual forma, la Sección 3.15 de la LPAU, 3 LPRA sec. 9655, permite que una parte afectada adversamente por un dictamen administrativo solicite su reconsideración. En específico, la referida sección dispone, pertinentemente, que:

> La parte adversamente afectada por una resolución u orden parcial o final podrá, dentro del término de veinte (20) días desde la fecha de archivo en autos de la notificación de la resolución u orden, presentar una moción de reconsideración de la resolución u orden. La agencia dentro de los quince (15) días de haberse presentado dicha moción deberá considerarla. Si la rechazare de plano o no actuare dentro de los quince (15) días, el término para solicitar revisión comenzará a correr nuevamente desde que se notifique dicha denegatoria o desde que expiren esos quince (15) días, según sea el caso. Si se tomare alguna determinación en su consideración, el término para solicitar revisión empezará a contarse desde la fecha en que se archive en autos una copia de la notificación de la resolución de la agencia resolviendo definitivamente la moción de reconsideración. Tal resolución deberá ser emitida y archivada en autos dentro de los noventa (90) días siguientes a la radicación de la moción de reconsideración. Si la agencia acoge la moción de reconsideración pero deja de tornar alguna acción con relación a la moción dentro de los noventa (90) días de ésta haber sido radicada, perderá jurisdicción sobre la misma y el término para solicitar la revisión judicial empezará a contarse a partir de la expiración de dicho término de noventa (90) días salvo que la agencia, por justa causa y dentro de esos noventa (90) días, prorrogue el término para resolver por un período que no excederá de treinta (30) días adicionales.
>
> [...]

Por otro lado, la Sección 4.2 de la LPAU, 3 LPRA sec. 9672, establece, en lo aquí atinente, que:

> Una parte adversamente afectada por una orden o resolución final de una agencia y que haya agotado todos los remedios provistos por la agencia o por el organismo administrativo apelativo correspondiente podrá presentar una solicitud de revisión judicial ante el Tribunal de Apelaciones, dentro de un término de treinta (30) días contados a partir de la fecha del archivo en autos de la copia de la notificación de la orden o resolución final de la agencia o a partir de la fecha aplicable de las dispuestas en la Sección 3.15 de esta Ley cuando el término para solicitar la revisión judicial haya sido interrumpido mediante la presentación oportuna de una moción de reconsideración.

Así pues, el alcance de la facultad judicial revisora se enfoca en determinar: (1) que el remedio concedido por la agencia fuese el apropiado; (2) si las determinaciones de hecho estuvieran basadas en evidencia sustancial que obre en el expediente administrativo; y (3) si las conclusiones de derecho fueron correctas mediante su revisión completa y absoluta. Sección 4.5 de la LPAU, 3 LPRA sec. 9675.

Cónsono con lo anterior, el Tribunal Supremo de Puerto Rico ha expresado que, al revisar las determinaciones de hechos, los tribunales deben revisar el criterio de la agencia cuando las determinaciones no están fundamentadas en evidencia sustancial. *Hernández Feliciano v. Mun. Quebradillas, supra*, pág. 115. "Evidencia sustancial es 'aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión'". *Empresas Ferrer v. ARPe, supra*, pág. 266 (citando a *Hernández, Álvarez v. Centro Unido*, 168 DPR 592, 615 (2006)). La parte que impugne una determinación "tiene que convencer al tribunal de que la evidencia en la cual se apoyó la agencia para formular tales determinaciones no es sustancial". *Otero v. Toyota*, 163 DPR 716, 728 (2005).

Por otro lado, en *Vázquez v. Consejo de Titulares*, 2025 TSPR 56, 215 DPR ___ (2025), nuestro Máximo Foro local revisitó el trato que los tribunales han de concederle a las determinaciones de hecho de las agencias administrativas. Lo anterior, a la luz del marco jurídico establecido por la Sección 4.5 de la LPAU, 3 LPRA sec. 9675, y lo resuelto por el Tribunal Supremo de Estados Unidos en *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).

Según la referida Sección 4.5 de la LPAU, 3 LPRA sec. 9675, las conclusiones de derecho "serán revisables en todos sus aspectos por el tribunal". Nuestro Más Alto Foro local reiteró que las conclusiones e interpretaciones de las agencias merecían gran consideración, y que la revisión judicial se limitaba a determinar si estas habían actuado arbitraria o ilegalmente. *Vázquez v. Consejo de Titulares, supra*. Sin embargo, advirtió que esta consideración no equivalía a una renuncia de nuestra función revisora. Conforme a *Loper Bright Enterprises v. Raimondo, supra*, el Tribunal Supremo de Puerto Rico concluyó que la interpretación de la ley "es una tarea que corresponde inherentemente a los tribunales". *Vázquez v. Consejo de Titulares, supra*. Por lo tanto, será deber de los tribunales revisar las conclusiones de derecho de las agencias en todos sus aspectos, guiados por los mecanismos interpretativos propios de los tribunales y no de las agencias.

Conforme a la nueva normativa, los tribunales deben ejercer un juicio independiente al de la agencia administrativa, cuando les corresponde decidir si una agencia ha actuado dentro del marco de las facultades que se le han delegado estatutariamente. *Vázquez v. Consejo de Titulares, supra*. No obstante, contrario a la práctica pasada, los tribunales no vienen obligados a darle deferencia a las interpretaciones de derecho realizadas por las agencias administrativas simplemente cuando la ley es ambigua. *Íd.* Al interpretar *Loper Bright Enterprises v. Raimondo, supra*, nuestro Máximo Foro local concluyó que esto es así pues son los tribunales, bajo su función judicial, los que deben ejercer un juicio independiente al determinar el significado de las disposiciones estatutarias interpretadas por las agencias administrativas. *Vázquez v. Consejo de Titulares, supra*.

Igualmente, el Tribunal Supremo de Puerto Rico aclaró que, al ejercer dicho criterio, los tribunales pueden apoyarse de las interpretaciones realizadas por las agencias, pues son estas las que tienen responsabilidad de aplicar ciertas leyes. *Íd.* No obstante,

indicó que "tales interpretaciones 'constituyen un acervo de experiencias y criterios informados a los cuales los tribunales y los litigantes bien podrán recurrir a modo de guía' . . . y no avalar ciegamente, como se solía hacer en el pasado." *Íd.* (citando a *Loper Bright Enterprises v. Raimondo, supra*) (traducción en el original).

A esos efectos, el Máximo Foro hizo referencia a la hermenéutica legal, que no es otra cosa sino el proceso de auscultar, averiguar, precisar y determinar cuál es la voluntad legislativa. *Class Fernández v. Metro Health Care Management System, Inc.*, 214 DPR 348, 364 (2024).

Este método de interpretación se utiliza, no solamente en la interpretación de estatutos, sino también, en la de los reglamentos administrativos. *IFCO Recycling v. Aut. Desp. Sólidos, supra*, pág. 738; véase, además, R.E. Bernier y J.A. Cuevas Segarra, *Aprobación e Interpretación de las Leyes en Puerto Rico*, 2da ed., San Juan, Pubs. JTS, 1987, Vol. I, pág. 241.

## B. El Reglamento de Procedimientos Adjudicativos ante el Departamento de Vivienda

Por otro lado, el Reglamento Núm. 4953, de 12 de julio de 1993, *Reglamento para Regular los Procedimientos de Adjudicación Formal en el Departamento de la Vivienda y sus Agencias Adscritas* (Reglamento Núm. 4953),[17] tuvo como propósito "sistematizar y crear un cuerpo uniforme de reglas mínimas en el Departamento de la Vivienda y sus agencias adscritas para gobernar las determinaciones a seguirse en los procesos adjudicativos al emitir una orden o resolución que defina los derechos y deberes legales" de las partes. Artículo II del Reglamento Núm. 4953.

Ello con el propósito de que una persona puede promover, mediante la presentación de una querella o recurso al amparo de dicho reglamento, una "reclamación contra la agencia con relación

---

[17] Cabe destacar que el Reglamento Núm. 4953 fue derogado por el Reglamento Núm. 9618, de 21 de noviembre de 2024, *Reglamento Sobre Procedimientos Adjudicativos Formales del Departamento de la Vivienda y sus Agencias Adscritas*. Sin embargo, toda vez que los hechos del presente caso se suscitaron, así como que el procedimiento administrativo adjudicativo inició, durante la vigencia del derogado reglamento, haremos referencia a este.

a cualquier acción, omisión, decisión, práctica o infracción imputada a la agencia." Artículo X del Reglamento Núm. 4953.

Igualmente, la antedicha pieza reglamentaria dispone que, en los procedimientos adjudicativos, se salvaguardarán los siguientes derechos: (1) notificación oportuna de los cargos, querellas o reclamos en contra de una parte; (2) presentación de evidencia; (3) adjudicación imparcial; (4) y que la decisión sea basada en el expediente. Artículo V del Reglamento Núm. 4953.

Asimismo, preceptúa que un oficial examinador podrá presidir los procesos adjudicativos. En ese sentido, el Artículo XXIII del referido reglamento dispone que el oficial examinador deberá presentar un informe al jefe o jefa de la agencia, que contenga sus determinaciones de hechos, conclusiones de derecho y recomendaciones sobre el caso.

De ahí, el jefe o jefa de la agencia deberá emitir la resolución u orden final del caso basado en el informe del oficial examinador y el expediente del caso. Artículo XXIV del Reglamento Núm. 4953. De igual forma, el referido reglamento reconoce los mecanismos de reconsideración y revisión judicial.

En específico, el Artículo XXVI del Reglamento Núm. 4953, en lo pertinente, dispone que, dentro del término de veinte (20) días desde la fecha de archivo en autos de la notificación de la resolución final, la parte adversamente afectada por esta podrá solicitar su reconsideración. Asimismo, si la agencia no actúa sobre el petitorio de reconsideración dentro de los quince (15) días, el término para solicitar revisión judicial comenzará a contar nuevamente desde que expire el término de quince (15) días.

Por otro lado, el Artículo XXVII del antedicho reglamento establece que, si la agencia no considera oportunamente o rechaza la solicitud de reconsideración, perderá la jurisdicción sobre esta y el término para solicitar la revisión judicial ante el foro judicial revisor, empezará a contarse a partir de la expiración de dicho término. De igual forma, el referido artículo especifica que la moción

de reconsideración será jurisdiccional para solicitar la revisión judicial.

**C. Las Guías del Programa de Fiabilidad y la Resiliencia de Energía Eléctrica (ER2)**

El Congreso de Estados Unidos destinó ciertas ayudas a Puerto Rico para atender las necesidades causadas por los desastres provocados por los Huracanes Irma y María. En atención a ello, a través del Departamento de Vivienda y Desarrollo Urbano de Estados Unidos (conocido como HUD, por sus siglas en inglés), se asignaron los fondos CDBG-DR, en aras de abordar las debacles causadas por los eventos atmosféricos, como la crisis energética.

Asimismo, facultó a los recipientes de dichas subvenciones, como lo es el Departamento de la Vivienda de Puerto Rico, para promulgar políticas y procedimientos con el fin de evaluar la costo-efectividad de los proyectos propuestos relacionados con mejoras en el sistema energético puertorriqueño. De conformidad con lo anterior, el 2 de junio de 2023, se establecieron las Guías del Programa ER2, las cuales fueron también enmendadas en el 2025 sin alterar sustancialmente las disposiciones atinentes al recurso ante nos.[18]

En lo pertinente, la Sección 5.1 de las Guías del Programa ER2 de 2023, análoga a la Sección 5.1 en las Guías del Programa ER2 de 2025, establece que los fondos CDBG-DR financiarán el mejoramiento del sistema eléctrico, incluyendo el desarrollo de nuevos sistemas de energía eléctrica. Asimismo, la Sección 5.2 de las Guías del Programa ER2 de 2023, cuya homóloga en la versión enmendada de 2025 es la Sección 5.5, dispone que las empresas privadas con fines de lucro pueden participar como entidades elegibles para recibir dichos fondos y financiar sus propuestas de proyectos dirigidos al mejoramiento del sistema eléctrico.

---

[18] Según surge de las disposiciones allí establecidas, las Guías se rigen tanto por el Reglamento Núm. 4953, así como la LPAU, *supra.*

A su vez, la Sección 5.3.2 de las Guías del Programa ER2 de 2023, establece los requisitos para participar del programa. Entre ellos, la Sección 5.3.2.6, intitulada *Leveraging Funds – Non-CDBG-DR Funding*, cuya equivalente, en la versión de 2025, es la Sección 5.10.6, dispone que los solicitantes deben apalancar el financiamiento de sus proyectos.

En específico, dispone lo siguiente:

> *Given the anticipated magnitude of projects in this Program, Applicants and Subrecipients will be required to provide a description(s), if applicable, regarding the source and amount of non-CDBG-DR funds committed to the project and what actions have been taken to assess if additional funding is available to bring to the project. **For private entities, non-CDBG-DR funds must account for at least 40% of the total cost of the project**.*

(Énfasis nuestro).

Mientras que la Sección 5.10.6 de la versión de 2025 de las Guías del Programa ER2 dispone que:

> *Given the anticipated magnitude of projects in this Program, Applicants and Subrecipients will be required to provide a description, if applicable, regarding the source and amount of non-CDBG-DR funds committed to the project and what actions have been taken to assess if additional funding is available to bring to the project. **For private entities, non-CDBG-DR funds must account for at least 40% of the project's total cost**.*

(Énfasis nuestro).

De lo anterior se colige que, las Guías del Programa ER2 establecen los criterios que el Departamento, a través de la Oficina del Programa ER2, utiliza para seleccionar las propuestas que se beneficiarán de las subvenciones. En ese sentido, la Sección 6.1 de las Guías del Programa ER2 de 2023, cuya homóloga es la Sección 6.1 en las guías enmendadas de 2025, distingue entre los criterios de umbral, que constituyen, según establece dicha sección, requisitos mínimos que los proyectos deben cumplir para ser elegibles, así como los criterios de priorización.

En específico, la Sección 6.1 de las Guías del Programa ER2 de 2023 dispone lo siguiente:

> *Potential projects will be evaluated by PRDOH using criteria that incorporates PRDOH ER2 Program Priorities in addition to core eligibility thresholds. **Threshold Criteria are required as a baseline for the project to be considered eligible**. Prioritization Criteria will be used to select, prioritize, or*

*otherwise award a project as part of the Program. Selected projects must meet a HUD National Objective, have a logical nexus with the Unmet Needs Assessment, and consist of CDBG-DR eligible activities under the Action Plan and these Program Guidelines.*

(Énfasis suplido) (nota al calce omitida).

A su vez, la Sección 6.1 de la versión de 2025, equivalente a la antedicha Sección 6.1 en la versión de 2023, de las Guías del Programa ER2, dispone que:

*Potential projects will be evaluated by PRDOH using criteria that incorporates ER2 Program priorities in addition to core eligibility thresholds. **Threshold Criteria are required as a baseline for the project to be considered preliminarily eligible**. Prioritization Criteria will be used to select, prioritize, or otherwise award a project as part of the Program. Selected projects must meet a HUD National Objective, have a logical nexus with the Unmet Needs Assessment, and consist of CDBG-DR eligible activities under the Action Plan and Program Guidelines.*

(Énfasis suplido) (nota al calce omitida).

En adición, la Sección 6.1.1 de las Guías del Programa ER2 de 2023, cuya análoga, en la versión de 2025, es la Sección 6.2 (c), enumera los criterios de umbral. En específico, y en lo aquí atinente, el inciso (c) de la referida sección establece lo siguiente:

c. *Financial Viability*:

   i. ***For projects developed and owned by private entities, the Applicant has identified non-CDBG fund sources to cover at least 40% of the total project cost***.

   ii. *For all projects, funding has been identified to cover long-term O&M of the project after it has been placed in service, including vegetation management, as applicable.*

(Énfasis suplido) (subrayado en el original).

Mientras que, la Sección 6.2 (c) en la versión de 2025 de las Guías del Programa ER2, equivalente a la antedicha, establece lo siguiente:

c. *Funding sources*:

   i. ***For projects developed and owned by private entities, the Applicant has identified non-CDBG-DR fund sources to cover at least 40% of the total project cost***.

   ii. *For all projects, funding has been identified to cover long-term O&M of the project after it has been*

> *placed in service, including vegetation management, as applicable.*

(Énfasis suplido) (subrayado en el original).

La Sección 6.2 de las Guías del Programa ER2 de 2023, convertida en las Secciones 6.4 y 6.5 en la versión de 2025 de estas, regula los tipos de selección de proyectos.

En lo aquí atinente, la Sección 6.2.2 de las Guías del Programa ER2 de 2023, cuya homóloga, en la versión de 2025, es la Sección 6.5, rige el tipo de selección de proyecto en la forma de aplicaciones competitivas a la financiación disponible del Programa ER2. En lo pertinente, establece que:

> *Projects will also be selected for the Program through a competitive application process. . . .* ***Eligible projects will be identified by Applicants and submitted to PRDOH through an open application for evaluation and selection based on established Threshold and Prioritization criteria detailed above in the Project Selection Criteria section****.*
>
> *Interested applicants may apply to the ER2 Program by completing an online application in the Grant Application Portal ([GAP]) accessed via the Program's webpage. Applicants will be required to provide supporting documents required for eligibility review, entity capacity evaluation, and duplication of benefits review.* ***All documentation submitted by the Applicant must be complete and valid at the time of submission****.*
>
> [...]
>
> *The project concept within the application will serve as the core document that establishes CDBG-DR eligibility and performance parameters for the project. PRDOH will utilize multiple review processes and a scoring system to determine which projects to fund. In reviewing the application, the PM, in coordination with PRDOH and its designated representatives, conducts a thorough review of the initial application submitted by each applicant. This review will include, but will not necessarily be limited to, the following*:
>
> - *Completeness Review;*
> - *Eligibility Review;*
> - ***Threshold Review****;*
> - *Prioritization Review;*
> - *Duplication of Benefits Review;*
> - *Compliance Review;*
> - *Project Concept Review;*
> - *Entity Capacity Assessment (for public entities);*
> - *O&M Preliminary Form and Funding Strategy Review[.]*

(Énfasis suplido) (notas al calce omitidas).

En tanto, la Sección 6.5 de la versión de 2025 de las Guías del Programa ER2, análoga a la referida Sección 6.2.2 de la versión de 2023, dispone que:

*Projects will also be selected for the Program through a competitive application process. . . Eligible projects will be identified by Applicants and submitted to PRDOH through an open application for **evaluation and selection based on the threshold and prioritization criteria** detailed in the Project Selection Criteria section above.*

*Interested applicants may apply to the ER2 Program by completing an online application in the Grant Application Portal (**GAP**) accessed via the Program's webpage. Applicants will be required to provide supporting documents necessary for eligibility review, entity capacity evaluation, financial assessment, and duplication of benefits review. **All documentation submitted by the Applicant must be complete and valid at the time of submission**.*

(Énfasis suplido).

Ahora bien, la Sección 6.5.2 de la versión de 2025 de las referidas guías, la cual no cuenta con una equivalente en la versión de 2023, incorporó parte del cuerpo que, a su vez, constituía la Sección 6.2.2 de las Guías del Programa ER2 de 2023. Específicamente, la Sección 6.5.2, de la versión de 2025, dispone como sigue:

*PRDOH will utilize multiple review processes and a scoring system to determine which projects to fund. Once the application intake period closes, PRDOH and its designated representatives will conduct a completeness and preliminary eligibility review of each application. This review will include, but will not necessarily be limited to, the following:*

- *Completeness Review;*
- *Eligibility Review;*
- ***Threshold Review**;*
- *Prioritization Review;*
- *Duplication of Benefits Review;*
- *Compliance Review;*
- *Project Concept Review;*
- *Entity Capacity Assessment;*
- *O&M Preliminary Form and Funding Strategy Review[.]*

(Énfasis suplido) (nota al calce omitida).

En adición, y de conformidad con las disposiciones del Reglamento Núm. 4953, las Guías del Programa ER2 proveen para que aquellos participantes del Programa inconformes con cualquier determinación o denegatoria basadas en la política del este, soliciten la reconsideración y revisión administrativa. Sección 24, tanto de las Guías del Programa ER2 de 2023, como de 2025.

Igualmente, disponen que los participantes no contestes con la determinación final emitida por el Departamento, pueden solicitar un recurso de revisión judicial ante el Tribunal de Apelaciones.

Sección 24.2 de las Guías del Programa ER2 de 2023 y Sección 24.1.1, en la versión enmendada de 2025.

Expuesto el marco jurídico aplicable, procedemos a disponer del recurso ante nuestra consideración.

**III.**

En el presente caso, Energeólica señala cuatro (4) errores que, según aduce, cometió el Departamento al desestimar su recurso de revisión administrativa presentada para cuestionar la denegatoria que le fue notificada para participar del programa de financiamiento con fondos CDBG-DR. Particularmente, cuestiona que el recurrido haya emitido su determinación basándose en las Guías del Programa ER2 de 23 de enero de 2025, cuando la versión vigente de estas a la fecha de su solicitud al programa era de 2 de junio de 2023.

Asimismo, como segundo y tercer señalamiento de error, impugna que el Departamento haya interpretado que las Guías del Programa ER2 requerían, como criterio de umbral, que se presentara evidencia de fondos externos del 40% del costo total de su proyecto, cuando, según sostiene, las guías meramente requieren una descripción de los fondos externos.

Finalmente, aduce que el Departamento se equivocó al no considerar la información suplementaria presentada dentro de un término adicional que interpreta como concedido implícitamente por el recurrido. Así pues, por estar íntimamente relacionados entre sí, procederemos a discutir los cuatro (4) señalamientos de error conjuntamente.

En primer lugar, Energeólica sostiene que el recurrido, en contravención a la norma que rechaza la retroactividad de disposiciones legales, aplicó retroactivamente la versión de las Guías del Programa ER2 de 2025. Veamos.

En el caso ante nos, de un análisis de las conclusiones de la *Resolución Final y Orden*, aquí recurrida, es forzoso concluir que el foro administrativo hizo referencia a las Guías del Programa ER2 de

23 de enero de 2025. En lo pertinente, se refirió a las Secciones 5.10.6, 6.2 y 65, las cuales corresponden, respectivamente, a las Secciones 5.3.2.6, 6.1.1 y 6.2.2 de las Guías del Programa ER2 de 2 de junio de 2023.

Lo anterior, según aduce el recurrido en su escrito ante nos, fue por virtud de la Sección 25.2 de las Guías del Programa ER2 de 2023, la cual dispone que el Departamento se reserva el derecho de modificar las políticas establecidas en las mismas y que, de aprobar una nueva versión, esta reemplazará las versiones anteriores así como que deberá utilizarse como la aplicable en la continuación e implementación del Programa, desde su aprobación.

Sin embargo, no son de aplicación las normativas sobre la irretroactividad de las leyes o reglamentos administrativas, pues, independientemente de la procedencia de la aplicación retroactiva de las Guías del Programa ER2, lo cierto es que Energeólica no arguye ni presenta consecuencias sustantivas adversas por la aplicación de las Secciones correspondientes a las Guías del Programa ER2 de 2025.

Cabe resaltar que, si bien es excepcional, la retroactividad de las leyes o reglamentos debe analizarse al crisol de que la disposición en controversia sea de carácter sustantivo porque, ya sea que afecte derechos previamente adquiridos o incida la protección constitucional contra el menoscabo de obligaciones contractuales. *Consejo de Titulares del Condominio Acquamarina v. Triple-S Propiedad, Inc.*, 210 DPR 344, 363-364 (2022). En el caso de autos, no se desprende que Energeólica haya sido afectada en derechos adquiridos ni en obligaciones contractuales.

Más aún, como vimos, el contenido y exigencias de las Secciones de las Guías del Programa ER2 de 2025 atinentes al asunto ante nos, son esencialmente, iguales a las que corresponden a la versión de 2 de junio de 2023. Siendo así, al aplicar las Secciones, tanto de la versión de 2023 o la de 2025, el resultado es el mismo. Consecuentemente, no se cometió el primer error.

Por otro lado, como segundo y tercer señalamiento, la recurrente plantea que el Departamento erró en su interpretación de las Guías del Programa ER2, al determinar que Energeólica incumplió con los requisitos para participar del programa de financiamiento con fondos CDBG-DR. No le asiste la razón.

Como vimos, las Secciones 6.1 y 6.2, de la versión de 2023 y de 2025 de las Guías del Programa ER2, respectivamente, condicionan la elegibilidad de los participantes a que cumplan con los criterios de umbral. Así, la Sección 6.1.1 (c) y la Sección 6.2 (c), de las versiones de 2023 y 2025 de las Guías del Programa ER2, respectivamente, exigen como criterio de umbral, que todos los solicitantes hayan identificado fuentes de financiamiento externo a los fondos CDBG-DR que sufraguen al menos el 40% del costo total del proyecto propuesto.

De modo que, distinto a la interpretación de la recurrente, la Sección 6.2.2 de las Guías del Programa ER2 de 2023, y la Sección 6.5 de la versión de 2025 de estas, explícitamente disponen que la documentación de los aplicantes debe estar completa al momento de su solicitud.

Más aun, nótese que la propia solicitud al Programa ER2, que obra ante nos, surge la exigencia de prueba de los fondos externos asegurados. En particular, la solicitud requiere "*[s]upporting evidence of committed funds, if applicable. This can include a letter of commitment or award notice[.]*"[19] De igual forma, las instrucciones de la Solicitud establecen lo siguiente: "*Include only funds that have been awarded to the Applicant. Funds that have been requested and awaiting award shall not be included.*"[20]

Una lectura de la solicitud de Energeólica, que obra en el expediente ante nos, refleja que esta estableció que contaba con el 4% de los fondos.[21]

---

[19] SUMAC TA, Entrada Núm. 1, Apéndice 1, Anejo 4.2.
[20] *Íd.*, Entrada Núm. 6, Anejo C, pág. 17.
[21] *Íd.*, Anejo D, pág. 1.

En adición, no nos convence el planteamiento de la recurrente en cuanto a que subsanó la deficiencia en la identificación de financiamiento externo en su solicitud de reconsideración. Particularmente, Energeólica acompañó su petitorio de reconsideración con cartas de compromiso de diversas entidades financieras y planteó que había sometido la información que faltaba el 26 de julio de 2024.

Como es sabido, si bien no son de aplicación automática, las Reglas de Procedimiento Civil y su jurisprudencia interpretativa, nutren el derecho administrativo en cuanto estas no sean incompatibles con su carácter flexible. *Pérez v. VPH Motors Corp.*, 152 DPR 475, 484-485 (2000). Establecido lo anterior, es igualmente harto conocido que, "aunque en 'una moción de reconsideración no deben alegarse nuevos hechos que no han sido considerados por el [foro adjudicativo] al dictar la resolución cuya reconsideración se pide'; esto es permisible si se expresan razones poderosas para no haberlo hecho antes." *Rivera v. Algarín*, 159 DPR 482, 489-490 (2003) (citando a J.A. Cuevas Segarra, *Tratado de Derecho Procesal Civil*, San Juan, Pubs. JTS, 2000, Cap. VIII, pág. 765); véase, además, *Montañez Leduc v. Robinson Santana*, 198 DPR 543, 557 (2017).

En el presente asunto, no encontramos dichas razones. Todo lo contrario, pues, de un análisis del expediente, resulta forzoso concluir que la información relativa al financiamiento externo correspondiente al 40% del costo total del proyecto era, de conformidad con las Guías del Programa ER2, un requisito o criterio de umbral que le correspondía a Energeólica presentar en su solicitud a los fondos CDBG-DR y no en la etapa posterior.

De hecho, la propia recurrente, en su escrito ante nos, admite que ello no fue así pues reitera que, al solicitar al financiamiento del Programa ER2 el 30 de enero de 2024, evidenció "contar con una estrategia de obtención de medios de financiamiento alternativo

para el 40% del costo total del proyecto[.]"[22] De igual forma, sostiene que "cumplió informando en su Solicitud que se establecería una estrategia de financiamiento y que se encontraba en ese momento en el proceso de comprometer a entidades privadas interesadas en participar del proyecto."[23]

Es decir, Energeólica admite que, al momento de solicitar, no contaba con fuentes de financiamiento externo que totalizaran el 40% del costo de su propuesta de proyecto, sino con planes para obtenerlas y que ello era suficiente para cumplir con los requisitos de umbral de las Guías del Programa ER2. Sin embargo, tal y como interpretó el Departamento, las Guías del Programa ER2 no precisan que los solicitantes cuenten con estrategias de financiamiento privado para sufragar el 40% del costo de sus proyectos, sino que requieren, como requisito mínimo al solicitar, que estas, efectivamente, cuenten ("must account for") con dicho financiamiento.

En adición, tampoco nos convence el argumento esbozado por Energeólica sobre que la omisión de la Oficina del Programa ER2 de solicitar la información relativa al financiamiento externo en las dos (2) ocasiones en las que le cursó requerimientos de información. Ello, pues, el hecho de que no se solicitara dicha información, de ninguna manera subsanó la deficiencia de Energeólica de cumplir a cabalidad con las exigencias de las Guías del Programa ER2. Es decir, le correspondía a Energeólica cumplir todos los criterios de umbral requeridos y no a la Oficina del Programa ER2 a inquirir sobre su cumplimiento.

Correctamente, el Departamento precisó que una estrategia de obtención de fondos no satisfizo los criterios de umbral que condicionaban la elegibilidad de los solicitantes para participar de los fondos CDBG-DR, de conformidad con las Guías del Programa

---

[22] SUMAC TA, Entrada Núm. 1, *Revisión de Decisión Administrativa*, pág. 38 (énfasis suplido).
[23] *Íd.*, págs. 40-41 (énfasis suplido).

ER2. Consecuentemente, no le asiste la razón a la recurrente en su señalamiento de que el recurrido erró al determinar su inelegibilidad.

Por último, Energeólica plantea que el Departamento se equivocó al negarse a considerar la información suplementaria que presentó dentro de un término adicional que, según interpreta, fue concedido implícitamente por la agencia. Tampoco le asiste la razón.

Nótese que el término original, según lo admite Energeólica, fue el 30 de noviembre de 2023 y,[24] explícitamente, el Departamento lo extendió a 30 de enero de 2024, fecha en la cual Energeólica solicitó participar en el programa de fondos. De modo que, contrario a lo que sostiene la recurrente, la agencia no extendió los términos implícitamente cuando surge del expediente que la extensión fue debidamente notificada a todas las entidades interesadas en participar y de la cual, inclusive, Energeólica se benefició para solicitar.

Igualmente, no colegimos que el hecho de que el *Grant Application Portal* se mantuviera abierto y recibiendo documentos, implique una extensión implícita sujeta a la interpretación de los participantes que así lo entiendan. Más bien estimamos que, igual que lo plantea el Departamento, surge que el *Grant Application Portal* sirve como método de comunicación entre el Programa ER2 y los solicitantes. Consecuentemente, el cuarto error tampoco se cometió.

Luego de un análisis sosegado del expediente ante nos, no surge que la recurrente lograra demostrar que el Departamento actuó de forma arbitraria, ilegal o caprichosa al emitir su determinación, sino que esta se sostiene con el expediente administrativo y la normativa aplicable. Por las razones que anteceden, no procede revertir la determinación administrativa recurrida.

---

[24] SUMAC TA, Entrada Núm. 1, *Revisión de Decisión Administrativa*, pág. 32, n. 29.

**IV.**

Por los fundamentos que anteceden, confirmamos el dictamen administrativo recurrido.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones